CMM:JGM:jgm
F. #2005R01429

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**05 1230M** 

- - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

UNITED STATES OF AMERICA

    -against-

SIDNEY F. LEVINE,

    Defendant.

AFFIDAVIT AND COMPLAINT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT

(18 U.S.C. §§ 1349, 1343)

- - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

    MATTHEW GALIOTO, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

    Upon information and belief, on or about and between December 8, 2004 and August 23, 2005, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SIDNEY LEVINE, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud investors, and to obtain money and property from investors by means of materially false and fraudulent pretenses, representations and promises and, for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted, by means of wire communication in

interstate commerce, writings, signs, signals and sounds, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately 9 years. My primary assignment is the investigation of financial crimes. During the years that I have been a Special Agent, I have been involved in over 20 investigations relating to financial crime.

2. The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained during my participation in this investigation, information from other individuals including witness interviews and my review of documents related to this investigation. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for an arrest warrant, it does not set forth each and every fact that I learned during the course of this investigation.

BACKGROUND OF RELEVANT CORPORATIONS AND INDIVIDUALS

3. Rainmaker Managed Living, LLC ("Rainmaker NY") is a New York limited liability company located at 116 West 23rd Street, Suite 500, New York City, New York. Rainmaker NY

purports to be in the business of purchasing and developing real estate for use as assisted living centers and operating assisted living centers. Rainmaker NY also does business as "Rainmaker Realty Partners", "Rainmaker Realty Partners I," and Rainmaker Realty Partners II," although these do not appear to be legally cognizable entities. In addition Rainmaker NY has done business as "Rainmaker Managed Living, Mortgage Group 41505, LLC."

7. SIDNEY F. LEVINE ("LEVINE") is identified in some written offering materials as Rainmaker's Managing Partner. In some emails LEVINE has referred to himself as the C.E.O. of Rainmaker. Until recently LEVINE maintained an office at the headquarters of Rainmaker NY. LEVINE fields calls from potential Rainmaker investors who are routinely referred to him for more information by Rainmaker's sales agent, James Conway. I have interviewed persons employed at Rainmaker NY and I have reviewed affidavits of persons employed at Rainmaker NY. These individuals all identify LEVINE as the person who is in charge of and controls all of the activities of the various Rainmaker entities.

8. Alireza Dilmaghani ("Dilmaghani") is an attorney licensed in New York, and is the only identified member of Rainmaker NY and the sole shareholder and director of F&D. Some written offering materials identify Dilmaghani as Rainmaker's managing partner. Dilmaghani is the sole signatory on the Commerce Bank account held by Rainmaker NY into which all

Rainmaker investor funds have been deposited since December 2004.

9. James Joseph Conway ("Conway") is Rainmaker's sales agent, and he solicits investments in Rainmaker, including from potential investors who respond to newspaper advertisements seeking investors. Conway is the registered agent of Rainmaker CA and he maintains his office in California.

BACKGROUND OF INVESTIGATION

10. On or about June 16, 2005, I received a report on Rainmaker from Barry Minkow (the "Minkow Report"). Minkow is the director of the Fraud Discovery Institute, a private organization which employs a staff of accountants and investigators and provides forensic financial analysis as well as fraud protection training to both corporations and individuals. Minkow was initially retained by a Rainmaker investor who had concerns regarding his investment in Rainmaker. Minkow has provided reliable information to the F.B.I. and other law enforcement agencies in the past.

11. The Minkow Report claimed, in sum and substance, that the above-referenced corporations and individuals have been soliciting funds from investors for use in the acquisition and operation of nursing and assisted living facilities in New York and California, as well as other locations, and promising unusually high returns. Specifically, the Minkow Report claimed that the above-referenced individuals have been offering and selling investments in Rainmaker since at least the summer of

2004. The Minkow Report stated, among other things, that:

(a) based on the written opinion of a qualified expert in the field of nursing and assisted living facilities, which was attached to the Minkow Report, the returns offered by the above-referenced individuals are inconsistent with profit margins typical of the assisted living and nursing care facility industry;

(b) Minkow's searches of public records had failed to locate any real property owned or operated by the above-referenced corporations and individuals; and

(c) Minkow's searches of public records had failed to locate any licences to operate nursing or assisted living facilities issued in the name of any of the Rainmaker entities or individuals described above, in either New York or Los Angeles where Rainmaker claimed to be operating.[1]

INVESTOR SOLICITATIONS - OFFERING/PROMOTIONAL MATERIALS

12. Based on my review of the Minkow Report and documents and exhibits contained in the report, and my review of documents recovered during a search of Rainmaker NY, on August 23, 2005 MY as well as a conversation with an investor whose identity is known to me ("CS-1"), I know that Rainmaker has advertised in major newspapers, including The Wall Street Journal and the Los Angeles Times.

---

[1] Both New York and California require anyone operating a nursing facility or assisted living facility to be licensed.

Rainmaker has also maintained a website or websites explaining its business and the opportunity to invest in Rainmaker that I have personally reviewed.[2] These websites typically contain e-mail links that enable interested investors to contact LEVINE and others at Rainmaker electronically. Additionally, Rainmaker has mailed packages of offering or promotional materials to prospective investors.

13. I am informed by CS-1 that when he called the number listed in one of the newspaper advertisements, he reached Conway. Conway explained the investment in Rainmaker to CS-1, stating in substance that (1) investors will receive a "guaranteed minimum" return of 25% per year, paid monthly; (2) all investor money will be used solely for the acquisition or construction of assisted living centers; and (3) the Furman Law Firm will provide the funds to pay the 25% return while the company is acquiring and developing its assisted living centers, which funds will be generated from other activities such as providing legal services. CS-1 also met personally with Dilmaghani and LEVINE, who assured him that they would be compensated from the long term income stream generated by the operation of the facilities. After speaking with CS-1, Conway

---

[2] Until approximately June 2005, Rainmaker's website was located at www.realtypartners.org; its website is currently located at www.rainmakerlifecare.com. The content on the website has varied over time, although each iteration continues to solicit investments and repeats certain information, as described below.

mailed CS-1 a package of offering materials, which are described in more detail below.

14. While the content of Rainmaker's offering materials has changed over time, particularly with regard to the specific name of the entity in which the investor is to obtain an interest (all variations which begin with "Rainmaker"), they typically consist of a summary introduction sheet highlighting certain terms of the investment, an offering memorandum which is referred to variously as a "report" or "program report," samples of the certificates that investors will be issued as evidence of their interests, an "operating agreement" for the purported entity in which the investors will obtain an interest, a subscription agreement for investors to fill out and submit with their funds, and miscellaneous promotional materials, such as descriptions of properties purportedly under consideration for acquisition. Many of these same types of documents have appeared on one or more of Rainmaker's websites.

15. Typically, the summary introduction contained in the offering materials provides bullet point highlights of the investment. The highlighted representations that appeared in one version provided to investors were:

- o "25% Guaranteed Annual interest, paid monthly"

- o "Anticipated Rate of Return for the first year of 37%;"

- o "Anticipated Rate of Return for the second year of

>    49%;"
>
>    o   "Anticipated Rate of Return for the third year and each year thereafter of 60%;"
>
>    o   "The security of having your investment backed by California real estate;" and
>
>    o   "The ability to redeem your shares at anytime after the partnerships closes [sic]."

16. Another iteration of the offering materials promised investors that they would have "[t]he security of having your investment backed by multimillion dollar commercial real estate properties in the New York City and Southern California market that are owned by your partnership."

17. Not only do the offering materials conflict, as mentioned above, among versions, and sometimes within themselves, regarding the specific purported entities which are used to carry out the stated business of locating acquiring and developing real estate for use as assisted living centers, they are also somewhat confusing in describing the roles played by Dilmaghani and LEVINE. For example, in one version of the offering materials provided to an investor in late 2004, Dilmaghani is identified as the "managing partner" or as the "manager" of Rainmaker, while LEVINE is referred to variously as the "agent for Rainmaker Realty Partners" and as the "project manager" for Rainmaker. Dilmaghani is also the listed signatory on an unexecuted

operating agreement dated November 15, 2004 that was provided to investors. At times Dilmaghani is described as "General Counsel" to Rainmaker. On the Rainmaker website available June 30, 2005, LEVINE was identified as the "managing partner" for Rainmaker and the "managing member" of Rainmaker. LEVINE also appears as the signatory on at least one version of a "program report" provided to investors, which, while entitled a "report," purported to be an agreement between Rainmaker and the investors. LEVINE's name appears without title as the signatory of on a document currently available at the Rainmaker website entitled "Operating Agreement" which purports to be an agreement between Rainmaker and a prospective investor.

18. Investments in Rainmaker typically consist of purchasing units of interest for $1,000 each, with a minimum purchase requirement of $10,000. In the materials provided to investors and on the websites Rainmaker promises to use investors' money to acquire, build and refurbish assisted living centers for retirees.

19. According to the materials provided to investors, Rainmaker's management (sometimes referred to as LEVINE, sometimes Dilmaghani) will receive as compensation 25% of the profits from Rainmaker's operations as compensation, <u>once the facilities are operational</u>. Other portions of the offering material indicate variously that Rainmaker's management will receive $1 per year in compensation.

20. Similar to Conway's representations to CS-1, at least one version of Rainmaker's websites explained that while Rainmaker is acquiring and developing properties, the guaranteed 25% annual return to investors is going to be derived from a variety of sources, including short-term investments in real estate bridge loans, government securities, foreclosed rollovers, and "income from the operations of the Managing partners [sic] law firm, proceeds from collection on pending litigation, and consulting services to other third party assisted living and nursing facilities . . ."

21. Rainmaker's offering materials state that Rainmaker "seeks to invest 100 percent of its assets directly in real estate, commercial ventures, assisted living centers and real estate-related investments." The offering materials further assure investors that "[a]ll funds are held in an attorney's trust account for use in partnership real estate related activities only."

22. Rainmaker's offering materials promise that, upon reaching certain milestones, such as completion of the offering and the purchase of a certain amount of property by Rainmaker, it will "repurchase and/or arrange liquidation . . . within 30 to 60 business days of the demand for repurchase" any interests purchased by investors. Until recently, Rainmaker's website made a similar representation of the availability of refunds.

## THE USE OF INVESTOR FUNDS

29. I have reviewed subpoenaed bank records from Commerce Bank for any and all bank accounts held by Rainmaker NY or Alireza Dilmaghani. The records show that on December 8, 2004, Dilmaghani opened a Commerce bank account in the name of Rainmaker Managed Living, LLC, with the address listed as 116 West 23d Street, Suite 500, New York, New York. Dilmaghani is the sole signatory on the account.

30. A review of the Commerce bank records for the Rainmaker bank account as well as a list of investors circulated by Rainmaker in March 2005 shows that between December 8, 2004, and July 31, 2005, funds totaling $6.61 million from individuals who have been identified as Rainmaker investors were deposited into Rainmaker's Commerce Bank account.

31. Additional bank records for the Rainmaker Commerce bank account indicate that after the publication of the March 2005 investor list, additional individuals deposited approximately $1.45 million into Rainmaker's Commerce Bank account by check or wire transfer (some of which were interstate wires) in amounts equal to or larger than $10,000 (the minimum investment that Rainmaker accepted according to its own offering materials), and that checks were issued to these individuals on the Rainmaker account in amounts consistent with its guaranteed 25% return on investment. These individuals are believed to be investors.

32. A review of Rainmaker's Commerce bank account also indicates that from the period of its inception through July 31, 2005, an additional amount of approximately $208,000 from sources other than the above-referenced investors and individuals believed to be investors was deposited into the Rainmaker Commerce bank account. This amount represents approximately two and a half percent of the over 8 million dollars deposited into the Rainmaker bank account from its inception through July 31, 2005.

33. A review of the Rainmaker bank records shows that the following disbursements have been made from its inception through July 31, 2005:

(a) Approximately $1.76 million has been disbursed to bank accounts held in the name of James Conway. These funds were disbursed to Conway through Rainmaker checks signed by Dilmaghani.

(b) Approximately $2.04 million has been disbursed to the bank accounts of Alireza Dilmaghani. $1.05 million of these funds were disbursed to Dilmaghani either through Rainmaker checks signed by Dilmaghani and payable directly to Dilmaghani, or through checks signed by Dilmaghani and payable to cash which were then endorsed by Dilmaghani. In addition, $3.5 million of Rainmaker funds were disbursed to an account maintained by a company entitled "American Planning Corporation" through a check signed by Dilmaghani. Shortly thereafter American Planning

Corporation transferred 2.51 million back to Rainmaker's Commerce bank account, and $999,000 to Dilmaghani via check. Bank records regarding the opening of the "American Planing" account indicate that its address is "c/o Rainmaker Group, 116 West 23rd Street, Suite 500, New York, New York," and that the signatory on the account is "Loanna Checo." Loanna Checo is listed on the current Rainmaker website as an employee of Rainmaker.

(c) Approximately $879,000 has been paid out to investors from the Rainmaker Commerce Bank account in apparent attempt to satisfy Rainmaker's guarantee to return 25% per year to investors on a monthly basis.

(d) Approximately $760,000 has been disbursed to other corporations and individuals from the Rainmaker Commerce Bank account, including disbursements for operational expenses such as rent, telephone bills, and printing expenses.

34. A comparison of the above-referenced deposits into the Rainmaker bank accounts with the above-referenced disbursements from those accounts shows that only $208,000 flowed into the Rainmaker account from sources that could not be identified as investors. Thus, investor funds were used to pay Alireza Dilmaghani most or all of the more than $2 million he received, investor funds were used to pay James Conway most or all of the more than $1.7 million he received, and investor funds were used to pay investors most or all of the $879,000 interest they have received, in a clear pattern characteristic of a "Ponzi" scheme.

35. I have interviewed persons employed at Rainmaker NY and reviewed records seized during the execution of a search warrant at Rainmaker NY, and these interviews and records establish that LEVINE and Dilmaghani withdrew large amounts of cash from Rainmaker accounts on a weekly basis and used some of these funds to pay employees. LEVINE routinely kept amounts of up to ten thousand dollars in cash for himself during these transactions, and, on at least one occasion, LEVINE kept 100,000 dollars in cash that was withdrawn from a Rainmaker account.

## THE FALSITY OF DILMAGHANI, CONWAY AND LEVINE'S REPRESENTATIONS

36. Rather than segregating investor funds and using 100% of them to acquire and construct assisted living facilities as they had clearly promised, LEVINE, Dilmaghani and Conway have treated investor funds as if they were their personal assets. In particular, Dilmaghani, the sole signatory on the account into which investor funds have been deposited since December 2004, signed checks payable to himself, signed checks made out to cash which he then endorsed, and directed money to himself through American Planning Incorporated, in an amount totaling more than $2.03 million from December 2004 through July 2005. Much of these diverted funds were then given to LEVINE. In that same period, Dilmaghani also signed checks made payable to Conway totaling over $1.75 million.

37. Additionally, Rainmaker made more than $878,000 in purported interest payments to investors out of the account

during that time period, again contrary to the principals' promises to use Rainmaker investor funds solely for the acquisition and construction of assisted living facilities, and contrary to their promises that prior to the operation of such facilities interest payments to investors would be financed by activities such as short-term investments in real estate bridge loans, government securities, foreclosed rollovers, and "income from the operations of the Managing partners [sic] law firm, proceeds from collection on pending litigation, and consulting services to other third party assisted living and nursing facilities . . ." In fact, no documents were found during the search of Rainmaker NY which reflected any deposits into the Rainmaker accounts from any of the sources described above, and no documents whatsoever were recovered at Rainmaker NY which even reflected the existence of or Rainmaker or Rainmaker employees' involvement in any bridge loans or income therefrom, ownership of government securities, foreclosed rollovers, collections of proceeds from pending litigation, or consulting services to any entity.

38. Of the more than $4.65 million that Dilmaghani directed to himself, to Conway or LEVINE, or back to investors as purported interest payments, virtually all was investor money. The use of investor money in this fashion was clearly fraudulent, in that it directly contradicts the representations to investors by Dilmaghani, LEVINE and Conway that their funds would be used solely to acquire and develop assisted living facilities.

39. The payments to Dilmaghani and Conway have not been disclosed to investors. To the contrary, the Offering Materials state: "Your partnership is managed by an experienced law firm staffed with real estate professionals who work for you for free." Other portions of the Offering Materials state that Rainmaker's manager (sometimes identified as Dilmaghani, sometimes as LEVINE) will receive compensation of one dollar per year.

40. Unbeknownst to investors, in exchange for his work selling investments in Rainmaker, Conway receives a commission that he terms a "bonus," which depends on the amount he raises for Rainmaker. Neither the Offering Materials nor Conway disclose this compensation to investors, but as described above, Conway received over $1.75 million from the account into which investor funds were deposited from December 2004 through July 2005.

41. LEVINE, Dilmaghani and Conway promise investors that Rainmaker will "repurchase and/or arrange liquidation . . . within 30 to 60 business days of the demand for repurchase" any interests purchased by investors. However, they do not disclose that, as a result of their misappropriation, they have no reasonable basis to represent that refunds will be available for all investors.

42. Further, LEVINE, Dilmaghani and Conway repeatedly assured investors that the involvement of an experienced attorney and law firm was proof of the safety and legitimacy of their

investment program, promising investors that the "professional guidance of the Furman Law legal staff . . . which manages the Rainmaker Programs gives you a safety net never before experienced." However, the very attorney whose involvement is touted as enhancing the safety of the investment actually diverted investor funds from their promised use and thereby rendered the investment fundamentally unsafe.

DECEPTION OF INVESTORS REGARDING OWNERSHIP OF PROPERTY

43. During my investigation of this matter and during my review of documents recovered during the search of Rainmaker NY, as well as my interviews with Rainmaker employees, it has become clear that Rainmaker does not own any property or assisted living facilities as described in their offering materials. However, because Rainmaker promised investors that their funds would be used exclusively to purchase real estate, and promised them that the security of their investment was enhanced because it was backed by ownership of real property, after several months of operation Rainmaker investors began to request information about what properties were owned, and to request documentary evidence regarding such properties.

44. Consequently, LEVINE and Dilmaghani began negotiations to purchase a facility located in Kings Park, Long Island, called Sunken Meadow Adult Home. The facility was a small group of several buildings which housed approximately 37 people, most veterans. LEVINE and Dilmaghani traveled to the

facility, inspected it and, on March 23, 2005, signed an agreement to purchase it for approximately one million dollars. However, the agreement required Rainmaker to apply for and obtain certain licenses to operate the facility within specified time periods before closing would take place. Rainmaker did not comply with the terms of the agreement regarding these applications and the sellers eventually declined to proceed with closing. Nevertheless, on March 25, 2005, Rainmaker sent investors a letter entitled "IMPORTANT NOTICE TO MEMBERS" informing them that they were now "owners" of this property, "the most recent acquisition for our New York State portfolio," and claiming that Rainmaker was "operating" the facility. An unexecuted and undated copy of the purchase agreement was included in this mailing. In addition, an email was sent to investors throughout the country the next day from Rainmaker offices again informing investors that "we own" the Kings Park property and telling them that their ownership would be "recorded on the deed."

LEVINE'S DECEPTION AND FLIGHT

45. I was present at Rainmaker NY's offices on AUGUST 23, 2005 when the search warrant was executed. LEVINE was present during the execution of the warrant and an agent assisting in the execution of the warrant obtained pedigree information from him, including a social security number and a date of birth of 12/5/57. However, LEVINE appeared to be at least 60 years old. LEVINE then informed me that he needed insulin, and would return

to complete the interview in 45 minutes. LEVINE did not return to the location. Moreover, none of the employees of Rainmaker have seen or heard from Levine since that day. Levine's cell phone has not been answered and the mailbox is full.

46. I subsequently ran a Choice Point check on the social security number LEVINE provided and it came back as assigned to someone other than LEVINE.

47. Various records check for "Sidney Levine", including NCIC, DMV, Choice Point, and Dunn and Bradstreet disclose no one with a date of birth matching or similar to that provided by LEVINE, and no one with the address 140 West 75th Street, New York.

48. I am further informed by Spencer Bendell that since filing a civil complaint against LEVINE on August 23, 2005, the SEC has made exhaustive efforts to locate LEVINE in order to serve him with a copy of the complaint, without success.

49. Because of the ongoing nature of this investigation, and because LEVINE appears to have fled to avoid

apprehension and prosecution, I request that this affidavit be filed under seal.

_____
Special Agent Matthew Galioto
Federal Bureau of Investigation


SUBSCRIBED AND SWORN TO BEFORE ME THIS
26th day of September, 2005

_____
United States Magistrate Judge
Eastern District of New York